**INTERNATIONAL BUSINESS MACHINES CORPORATION, Petitioner,**

**v.**

**Honorable David N. EDELSTEIN, Chief Judge, United States District Court, Southern District of New York, and United States of America, Respondents.**

**No. 489, Docket 75–3056.**

United States Court of Appeals, Second Circuit.

Argued Oct. 22, 1975.

Decided Oct. 30, 1975.

---

\*　　\*　　\*　　\*　　\*　　\*

Thomas D. Barr, New York City (Cravath, Swaine & Moore, New York City, of counsel), for petitioner.

Bruce B. Wilson, Dept. of Justice, Washington, D. C. (Thomas E. Kauper, Asst. Atty. Gen., Barry Grossman, Robert B. Nicholson, John J. Powers, III, Attys., Dept. of Justice, Washington, D. C., Raymond M. Carlson, Charles Hamilton, Attys., Dept. of Justice, New York City, of counsel), for respondent United States of America.

Before MOORE, VAN GRAAFEILAND and MESKILL, Circuit Judges.

### PER CURIAM:

International Business Machines ("IBM") petitions this Court for extraordinary relief in the form of a writ of mandamus, pursuant to 28 U.S.C. § 1651 and Fed.R.App.P. 21. The petition focuses on certain rulings and practices adopted by Chief Judge Edelstein of the Southern District of New York in the conduct of a lawsuit currently being tried before him, *United States v. International Business Machines Corp.*, 69 Civ. 200, Civ. No. 72–344.

More specifically, IBM seeks relief from the acts of the trial judge in (1) precluding IBM from privately interviewing adverse witnesses; (2) refusing to file IBM's papers with the Clerk of the Court as required by Fed.R.Civ.P. 5(e); and (3) ordering IBM not to make oral motions in open court during the trial and directing that motions be in writing and within the time limits provided by the Rules. Before responding to these requests, we first give consideration to our jurisdiction and such limitations as there may be on the exercise of our discretionary power relating to the petition.

This is not an ordinary case, and this will not be an ordinary trial. The complaint was filed on January 17, 1969. In substance, it charged IBM with violations of Section 2 of the Sherman Act (15 U.S.C. § 2). The trial commenced on May 19, 1975 and the Government estimates that it will "last well over a year". It expects to call "more than one hundred witnesses", and to "offer several thousand exhibits" (Gov't.'s Br. 1 and 2). IBM will undoubtedly have a comparable number of witnesses and exhibits. So much for the magnitude of the trial which, having commenced in May 1975 and recessed for the summer, has now resumed.

### JURISDICTION

■ The Government asks that we "discourage in the strongest possible language the filing of petitions for extraordinary relief raising issues as insubstantial as those raised in this case". (Gov't. Br. 5). We decline to do so because we do not regard the issues as "insubstantial". We recognize that mandamus is not a substitute for an appeal, and that every disputed ruling during a trial should not be made the subject of a mandamus petition. However, the relief sought here is more fundamental. The errors complained of are not errors involving improper exercise of discretion; *see Stans and Mitchell v. Gagliardi*, 485 F.2d 1290 (2d Cir. 1973); rather they concern actions which, petitioner has charged, are entirely outside the permissible bounds of the trial court's discretion, and which exceed the trial court's jurisdiction. Such actions are properly reviewable by writ of mandamus. *See Parr v. United States*, 351 U.S. 513, 520, 76 S.Ct. 912, 917, 100 L.Ed. 1377 (1956). Moreover, appellate review will be defeated if the writ does not issue, for petitioner's claims are not of the kind that will be merged into any final judgment and thus capable of correction on appeal. This, too, is a proper ground for the issuance of a writ of mandamus. *Parr v. United States, supra.*

The asserted errors are wholly collateral to the resolution of the legal issues involved. They deal only with the manner of developing such issues. Restrictions which may impede the development, presentation and determination of facts should be avoided wherever possible—particularly at the comparative outset of such a trial as here.[1]

## I. RESTRICTIONS ON WITNESS INTERVIEWS

About a week before the commencement of the trial, at a pretrial conference on May 12, 1975, the trial judge told counsel "that if any one of you seeks to interview a witness in the absence of opposite counsel, that you do it with a stenographer present and *so that it can be available to the Court, for the Court to see it,* and I think that is the kind of condition that I would ask you to live up to." (Tr. 71) (Emphasis supplied). This direction was restated, in substance, during the trial. (Tr. 603).

The Court's ruling grew out of IBM's efforts to interview some of the individuals appearing on the Government's lengthy list of witnesses. We are told (and the Government has submitted no proof in contradiction) that upon learning of these interviews the Government ordered witnesses—two in particular, a Mr. Kraft and Lt. General Phillips—not to proceed with the interviews. Accordingly, both those prospective witnesses cancelled their interview appointments.[2]

As was to be expected, the Court's order proved to be quite unworkable. IBM found it difficult to arrange interviews with witnesses, usually corporate executives with offices outside New York City, at times and places which were convenient to both the witnesses and opposing counsel. Moreover, interviews in the presence of opposing counsel did not lend themselves to the free and open discussion which IBM sought. Interviews transcribed by court reporters were a most unattractive alternative.

The trial judge apparently looked upon an interview as the taking of a deposition. In fact, there is little relation between them. A lawyer talks to a witness to ascertain what, if any, information the witness may have relevant to his theory of the case, and to explore the witness' knowledge, memory and opinion—frequently in light of information counsel may have developed from other sources. This is part of an attorney's so-called work product.[3] It is the common experience of counsel at the trial bar that a potential witness, upon reflection, will often change, modify or expand upon his original statement and that a second or third interview will be productive of greater accuracy. Little wonder then that a witness being interviewed, as in two cases mentioned by IBM, would not wish to have his initial thoughts taken down by a court reporter as if it were sworn testimony in court.[4]

We find disturbing the stated purpose of the order "so that it can be available to the Court, for the Court to see it". This condition is tantamount to an insistence that the trial judge be present at every interview and thus become cognizant of each proposed witness' state-

---

1. *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); *Chabot v. National Securities and Research Corp.,* 290 F.2d 657 (2d Cir. 1961); *MacAlister v. Guterma,* 263 F.2d 65 (2d Cir. 1958).

2. The Government has claimed that "IBM was harassing its witnesses" (Gov't Br. 3), but offers no supporting proof thereof either from an allegedly harassed witness or his counsel. Under the circumstances no occasion for a protective order would have arisen.

3. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

4. In contrast to the pre-trial interview with prospective witnesses, a deposition serves an entirely different purpose, which is to perpetuate testimony, to have it available for use or confrontation at the trial, or to have the witness committed to a specific representation of such facts as he might present. A desire to depose formally would arise normally after preliminary interviews might have caused counsel to decide to take a deposition.

ments even though such witness may never be called upon to testify. Again, it is common experience that, in presenting his case, counsel will offer the important (in his opinion) testimony which supports his theory of the case and discard the unimportant, his opponent having the same privilege.

■ We believe that the restrictions on interviewing set by the trial judge exceeded his authority. They not only impair the constitutional right to effective assistance of counsel but are contrary to time-honored and decision-honored principles, namely, that counsel for all parties have a right to interview an adverse party's witnesses (the witness willing) in private, without the presence or consent of opposing counsel and without a transcript being made. And, since the role of the trial judge is to pass upon the admissibility of proof, when and as offered, and to render his decision upon admitted proof, it follows that witness statements, if taken, should not be made available to the court in advance.

There is no question but that the trial judge did not intend adverse results to flow from his rulings. On the contrary, the record indicates that he felt the establishment of formalized interview procedures would aid the Court in its ultimate determination on the merits[5] and would also insure the integrity of the trial by guarding against the exercise of undue influence upon prospective witnesses by interviewing attorneys.[6]

■■ Both of these purposes are indicative of the high standards which Judge Edelstein has set for the conduct of this extraordinarily complex and massive lawsuit, and we agree that it is vital for the Court to make decisions which are as informed as possible, based upon testimony which represents the true opinion and conclusions of the witness who offers it. However, we are in disagreement as to the method best suited to achieve this end. In particular, we are

concerned that the means chosen by Judge Edelstein have unduly infringed upon counsels' ability to prepare their case for trial, and have, in addition, lessened the effectiveness of that trial by placing before the Court, not the case as finally prepared and refined by counsel, but rather a hodgepodge of information accumulated in the early stages of counsel's preparation. We believe that it does a disservice both to the parties and to the Court to subject to the Court's scrutiny the process by which counsel researches, develops and integrates the case which he ultimately presents. Counsel cannot be expected to have formulated a finished presentation at the outset of his preparation and endeavors. To require that his initial investigatory efforts be of a quality which counsel would willingly include as part of his client's final case is to set up an impossible standard; to ask him to submit his initial probings, notwithstanding their lack of effectiveness in his client's behalf, is in effect to ask counsel to deny his client the effective representation to which he is entitled. See, Code of Professional Responsibility, Canon 7.

■ The legitimate need for confidentiality in the conduct of attorneys' interviews, with the goals of maximizing unhampered access to information and insuring the presentation of the best possible case at trial, was given definitive recognition by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In that case, a suit for damages growing out of the accidental sinking of a tugboat, the defense attorney was ordered by the District Court to produce all written statements of witnesses made prior to trial, and to further disclose information gathered through oral interviews which the attorney did not subsequently record. Because the court's opinion is so pertinent to the petition presently before this Court, we quote from it at length.

Proper preparation of a client's case demands that he assemble information,

---

5. Transcript, p. 71, May 12, 1975 Pre-trial conference.

6. Ibid. p. 106.

sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case [153 F.2d 212, 223] as the "Work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

\* \* \* \* \* \*

[A]s to oral statements made by witnesses to Fortenbaugh, whether presently in the form of his mental impressions or memoranda, we do not believe that any showing of necessity can be made under the circumstances of this case so as to justify production. Under ordinary conditions, forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness. No legitimate purpose is served by such production. The practice forces the attorney to testify as to what he remembers or what he saw fit to write down regarding witnesses' remarks. Such testimony could not qualify as evidence; and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and much more an ordinary witness. The standard of the profession would thereby suffer.

Denial of production of this nature does not mean that any material, non-privileged facts can be hidden from the petitioner in this case. He need not be unduly hindered in the preparation of his case, in the discovery of facts or in his anticipation of his opponents' position. Searching interrogatories directed to Fortenbaugh and the tug owners, production of written documents and statements upon a proper showing and direct interviews with the witnesses themselves all serve to reveal the facts in Fortenbaugh's possession to the fullest possible extent consistent with public policy.

329 U.S. at 511, 512–13, 67 S.Ct. at 393–4, 394–5.

█ Numerous cases since *Hickman* have upheld, absent a showing of undue hardship or prejudice, the confidentiality of statements taken by counsel in the course of pre-trial interviews. *See, e. g., Dingler v. Halycon Linjn N.V.,* 50 F.R.D. 211 (E.D.Pa.1970); *Herrick v. Barber Steamship Lines, Inc.,* 41 F.R.D. 51 (S.D.N.Y.1966); *Koss v. American Steamship Company,* 27 F.R.D. 511 (E.D.Mich.1960).

Building on the rationale of *Hickman,* courts have also specifically forbidden interference with the preparation of a client's defense by restricting his counsel's ability to freely interview witnesses willing to speak with him. In *Gregory v. United States,* 125 U.S.App.D.C. 140, 369 F.2d 185 (1966), a prosecutor advised witnesses not to talk to anyone unless he, the prosecutor, were present. The Court of Appeals disallowed such conduct on the ground that it amounted to impermissible interference with the preparation of defendant's defense:

[W]e know of nothing in the law which gives the prosecutor the right to interfere with the preparation of the defense by effectively denying defense

counsel access to the witnesses except in his presence. . . .

We do not, of course, impugn the motives of the prosecutor in giving his advice to the witnesses. Tampering with witnesses and subordination of perjury are real dangers, especially in a capital case. But there are ways to avert this danger without denying defense counsel access to eye witnesses to the events in suit unless the prosecutor is present to monitor the interview. We cannot indulge the assumption that this tactic on the part of the prosecution is necessary. . . .

A criminal trial, like its civil counterpart, is a quest for truth. That quest will more often be successful if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined. . . . It is not suggested here that there was any direct suppression of evidence. But there was unquestionably a suppression of the means by which the defense could obtain evidence. The defense could not know what the eye witnesses to the events in suit were to testify to or how firm they were in their testimony unless defense counsel was provided a fair opportunity for interview. In our judgment the prosecutor's advice to these eye witnesses frustrated that effort and denied appellant a fair trial.

369 F.2d at 188–9.

The same conclusion has been reached in this Circuit, and we support it wholeheartedly. In *Coppolino v. Helpern*, 266 F.Supp. 930 (S.D.N.Y.1967), the District Court stated that:

[A]s to interviewing a prospective prosecution witness, our constitutional notions of fair play and due process dictate that defense counsel be free from obstruction, whether it come from the prosecutor in the case or from a state official or another state acting under color of law.

A trial is a search for the truth. This is no less true in a criminal matter than in a civil matter. . . . A lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal case without the consent of opposing counsel. . . . The right to effective counsel embraces more than just the right to retain counsel.

266 F.Supp. at 935–6.

The same theme was reiterated in *Johnston v. National Broadcasting Co.*, 356 F.Supp. 904 (E.D.N.Y.1973) wherein the Court capsulized the rule as follows:

While it is true that any witness has the right to refuse to be interviewed if he so desires, . . . it is equally true that the State may not bar a prospective witness from speaking with defense counsel, when and if such witness so desires. (citations omitted)

356 F.Supp. at 910.

■ For all the reasons above set forth, we grant the petition for relief from the District Court's rulings relating to the conduct of out-of-court interviews. Such interviews may be conducted confidentially, without the presence of opposing counsel or reporter, whenever the person interviewed is willing to proceed in this manner.

## II. NON–FILING OF PAPERS SUBMITTED BY PETITIONER

In his Trial Order No. 3 of September 23, 1975, the trial judge formalized a procedure instituted by him in mid-1974 whereby all papers connected with *U. S. v. IBM* were to be sent to the Court's chambers instead of being filed with the Clerk.

Petitioner has submitted a lengthy appendix consisting of papers which Judge Edelstein has refused to forward to the Clerk for filing, primarily on grounds of untimely submission or faulty proof of service. Petitioner contends that the Court's refusal to file some of these papers is based upon an erroneous interpretation of the Southern District's Local General Rule 9 and Rule 6(a) of the Federal Rules. While the correctness of Judge Edelstein's construction of those

rules will not be reviewed on this mandamus petition, we must consider whether the manner in which the judge gave effect to his construction of the Rules was within the ambit of his proper authority.

Had the trial judge chosen simply to deny Petitioner's motions, IBM could complain of no usurpation of power. The judge's refusal to file IBM's papers, however, does raise such issue, because the Petitioner is thereby prevented from making a record for purposes of appeal. It need hardly be stated that the trial record is composed of the proceedings in the District Court including all papers, exhibits, and affidavits on file with the Court. See 9 Moore's *Federal Practice* (1975 ed.), ¶¶ 210.03, 210.04. It is not the type of paper submitted but rather the fact of filing which determines whether a particular item will be included in the record. *Todd v. Nello L. Teer Co.*, 308 F.2d 397, 399 (5th Cir. 1962) (letter addressed to court properly regarded on appeal as part of trial record where it had been previously filed with the trial court).

 Filing at the trial court level with a view to "making a record" is crucial because, absent extraordinary circumstances, federal appellate courts will not consider rulings or evidence which are not part of the trial record. *Wyndham Associates v. Bintliff*, 398 F.2d 614, 620 (2d Cir. 1968); *Mahoney v. Federal Savings & Loan Ins. Corp.*, 393 F.2d 156, 162 (7th Cir. 1968); *Andrews v. Olin Mathieson Chemical Corp.*, 334 F.2d 422, 425 (8th Cir. 1964). This is true whether the record is merely ambiguous or is affirmatively deficient with respect to any pa-

pers or orders of any kind. *First National Bank of Arizona v. British Petroleum Co.*, 324 F.Supp. 1348, 1359 (S.D.N.Y.1971); *Mitchell v. Trade Winds Co.*, 289 F.2d 278, 279 (5th Cir. 1961); *Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970). Moreover, it is of no avail to an appellant that the trial court itself may have prevented him from including a particular item in the trial record; the appellate court will not speculate about the proceedings below, but will rely only upon the record actually made.[7] *Little v. Green*, 428 F.2d 1061, 1070 (5th Cir. 1970) (Court of Appeals refused to consider question on appeal on grounds that it did not appear in trial record, where counsel claimed that trial judge prevented him from interposing an objection during trial).

Under the Federal rules, both Rule 10(a) and its forerunner former Rule 75(a)[8] the parties on appeal have the right to submit to the appellate court, for its consideration, those parts of the trial record which they choose to challenge or defend on review. The policy that it is the appealing parties, and not the trial court, who control the issues to be presented on appeal has been embodied in federal practice since the Federal Rules were adopted in 1938.[9] This Circuit formally adopted that policy in 1942, when Judges Swan and Augustus Hand joined in Judge Clark's opinion in *Treasure Imports v. Henry Amdur & Sons*, 127 F.2d 3 (2d Cir. 1942):

> The record is in a somewhat confused state, owing in part to an order of the district court that several of the matters designated by defendants for inclusion in the record should not be so

---

7. This is in contrast to the procedure in many states wherein pleadings and motions may be returned to parties unfiled, but where the party who sought to have the item filed may then take exception to the ruling, thereby preserving the issue for purposes of appeal. *See* 4A *C.J.S.* Appeal and Error § 736.

8. Rule 10(a) is taken virtually verbatim from the first part of former Rule 75(a), and the original comments to the old rule are considered to apply with equal force to Rule 75's

modern counterpart. *See*, 9 Moore's *Federal Practice* (1975 ed.) ¶ 210.01[1].

9. *See*, Remarks of Chairman of Advisory Committee at the New York Symposium on the Federal Rules, 1938 (Proceedings, pp. 325, 326); Remarks of Hon. William D. Mitchell, Chairman, Advisory Committee of the United States Supreme Court, Institute on Federal Rules of the American Bar Association, July 23, 1938.

included or transmitted to us. . . [T]he Federal Rules do not permit the district court to prevent parties from including in the record any part of the occurrences below which they wish thus included. 127 F.2d at 4.

On the basis of this policy, district courts have refrained from exercising any degree of control over the contents of the trial record,[10] even where parties have petitioned the trial court to exclude certain items from the record. *Westmoreland Asbestos Co. v. Johns-Manville Corp.*, 1 F.R.D. 249 (S.D.N.Y. 1940); *In re Sullivan*, 2 F.R.D. 238 (S.D. N.Y.1940). *See, also*, 9 Moore's *Federal Practice* (1975 Ed.) ¶¶ 210.03, 210.04[2].

Since Petitioner has no other means of presenting its arguments to the appellate court—whether as appellant or appellee—save by making the necessary record at the trial level, Judge Edelstein's refusal to file petitioner's motions has constituted an impermissible interference with petitioner's right to make the record it chooses for purposes of appeal.[11]

It is true that filing papers directly with the judge is permitted (to a limited extent) under Fed.R.Civ.P. 5(e):

> The filing of pleadings and other papers with the court as required by these rules shall be made by filing them with the clerk of the court, except that the judge may permit the papers to be filed with him, in which event he shall note thereon the filing date *and forthwith transmit them to the office of the clerk.* (Emphasis supplied)

Filing directly with the Court may be necessary for the protection of the parties where, for example, the delay occasioned by first filing with the clerk will cause irreparable harm. *See, e. g., Application of President and Directors of Georgetown College, Inc.*, 118 U.S.App. D.C. 80, 331 F.2d 1000, 1006–7 (1964), *cert. denied*, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); 2 Moore's *Federal Practice* (1974 ed.) ¶ 15.11. It is not, however, a procedure to be invoked by the Court for the purpose of selectively determining what papers should properly constitute the trial record of the controversy before it. Rule 5(e), it should be emphasized, speaks only of the granting of permission to file papers with the Court; it does not speak of any judicial discretion to refuse thereafter to file papers with the Clerk. Moreover, we specifically note the rule's language that the Court "*may permit* the papers to be filed" with it (emphasis supplied); the use of "may permit" instead of "may order" suggests to us that such filing is proper only when the Court's discretion has been invoked by one of the parties for good cause, and that the rule was not intended to be invoked by the Court *sua sponte*.

We therefore conclude that all papers previously submitted to Judge Edelstein's chambers should have been considered filed within the meaning of Federal Rule 5(d) and 5(e), and transmitted to the Clerk's office, as contemplated by Rule 5(e).

## III. REFUSAL TO HEAR PETITIONER'S ORAL MOTIONS AT TRIAL

In addition to outlining procedures for the submission of papers directly to Judge Edelstein, Trial Order No. 3 required that all motions be submitted to the Court upon ten days' notice, with the exception of discovery motions which were to be submitted upon five days' notice. The effect of this order was to eliminate the parties' opportunity to make oral motions during trial, an opportunity which had already been substantially undercut by the trial court's refusal to entertain a number of motions

---

10. The only exception is where the accuracy of the recorded proceedings, or of any other item, is in issue. *See Westmoreland Asbestos Co. v. Johns-Manville Corp.*, 1 F.R.D. 249 (S.D.N.Y. 1940).

11. Whether or not an appeal is actually taken is immaterial, since the losing party clearly has the right to appeal if it chooses.

at trial on an oral basis. We agree with Judge Edelstein that the burden of hearing oral motions may prove onerous and even distracting during the course of a lengthy trial. We do not interpret the type of motion embraced within the purview of Trial Order No. 3 as covering the normal motions, of necessity made during a trial, such as objections to the admission of testimony or exhibits, motions to strike, etc. *Hammond-Knowlton v. Hartford-Connecticut Trust Co.*, 26 F.Supp. 292 (D.Conn.1939). And we believe that the judge himself intended no such interpretation. Accordingly, oral motions have been described as "obviously necessary to expedite the hearing or trial", 2A Moore's *Federal Practice* (1974 ed.) ¶ 7.05. They are not only contemplated but, absent unusual circumstances, virtually mandated by Federal Rule 7(b)(1), entitled "Motions and other Papers", which provides in part:

An application to the court for an order shall be made by motion which, *unless made during a hearing or trial*, shall be made in writing. . . . (emphasis supplied)

In *Alger v. Hayes*, 452 F.2d 841 (8th Cir. 1972) the Court held that

The type of "hearing" at which there is no need for reducing a motion to writing is one in which the proceedings are recorded.

452 F.2d at 843 (citations omitted).

 As long as an oral motion is made during a proceeding which falls under *Alger's* liberal definition of "hearing", the trial court cannot refuse to tender it or attempt to exclude it from the record, notwithstanding that the judge may reserve his decision on the motion until a later date.

We think that so far as the requirement of writing is concerned, it is sufficient that the motion was made in open court and entered upon the record immediately following the rendition of the verdict. It is not necessary that a motion be made in writing if made "during a hearing or trial".

*Witt v. Merrill*, 208 F.2d 285, 286 (4th Cir. 1953).

## IV. THE CONTROVERSY OVER THE FEBRUARY 7, 1975 STIPULATION AND THE FILING OF THE AFFIDAVITS ADDRESSED THERETO—THE MOTION TO SEAL

 Following one of IBM's requests for admissions, IBM moved the trial court for an order directing the Government to respond to the requests which had been submitted to it. This matter had allegedly been made the subject of a stipulation between IBM and the Government which led to a heated dispute between opposing counsel. IBM's motion was opposed by the Government, and IBM subsequently sought to file certain reply papers which are the subject of the Government's motion to seal presently before this Court. We issued a temporary order on October 16, 1975 granting the Government's motion pending our decision of IBM's petition for writ of mandamus. We have been advised that Judge Edelstein has determined to hold an evidentiary hearing with respect to this matter. Since we have already stated that the parties' papers are entitled to be filed with the Court and hereafter transmitted to the Clerk for the purpose of making a complete record, and since the Government's papers are already on file, both in the interests of fairness and compliance with Rule 7(b)(1) we see no reason why IBM's papers should not be filed. If either party upon good cause shown wishes to move to seal, such application can be made to the trial judge.

## CONCLUSION

This Court has the greatest respect for Judge Edelstein's efforts to conduct an orderly trial in the *U. S. v. IBM* suit and we are cognizant of the possibly unprecedented burdens which that case has presented. Our decision today is reached on the grounds that it will enable the parties to prepare the best case possible

for the Court's consideration, and, therefore, should assist in the District Court's eventual disposition of the suit based on all the facts counsel may appropriately bring before it.

The petition for writ of mandamus is granted in accordance with the views expressed in this opinion.